# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ANN MITCHELL, Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **Ray Anson Mitchell, Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 15-0360-CG-C** |
| | ) | |
| | ) | |
| **CITY OF MOBILE, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This matter is before the Court on Defendant Steven Chandler's ("Chandler")

Motion for Summary Judgment (Doc. 73) and Memorandum in Support (Doc. 75);

Defendant Miranda Wilson's ("Wilson") Motion for Summary Judgment (Doc. 78)

and Memorandum in Support (Doc. 80); and Defendant City of Mobile, Alabama's

("the City") Motion for Summary Judgment (Doc. 82).[1]  Plaintiff Ann Mitchell

("Plaintiff") responded in opposition (Doc. 89), to which Chandler and Wilson replied

(Doc. 94 and Doc. 99, respectively).  The City adopted Chandler's and Wilson's

replies.  (Doc. 97).  Also before the Court is a joint motion to strike the expert report

of retired Judge LaDoris Cordell filed by Defendants.  (Doc. 98).  For the reasons

stated below, the Court **GRANTS** the motions for summary judgment filed by

Defendants and **GRANTS** the motion to strike the expert report of retired Judge

---

[1] Chandler, Wilson, and the City are hereinafter collectively referred to as
Defendants.

LaDoris Cordell.

# I. NATURE OF THE CASE

This case arises out of a police shooting that took the life of Ray Anson Mitchell ("Mitchell"). His mother, Plaintiff Ann Mitchell, personal representative of Mitchell's estate, brought the present action against the police officers involved, Chandler and Wilson, and their employer, the City. The Complaint contains five separate counts. *See* (Doc. 1). Plaintiff alleges in Count I, pursuant to 42 U.S.C. § 1983, that Chandler and Wilson "unlawfully used excessive, unreasonable[,] and unnecessary deadly force" in violation of "the Fourth, Fifth, and/or Fourteenth Amendment to the United States Constitution." *Id.* at 5. From the best the Court can surmise, Count II alleges Chandler and Wilson assaulted and battered Mitchell, while a third officer, Patrick Palmer, neglected, or refused to prevent, their actions. *Id.* at 5–6.[2] Count III alleges the City conducted an improper investigation into the death of Mitchell. *Id.* at 6. Count IV alleges the City failed to properly train, investigate, supervise, or discipline its officers. *Id.* at 6. Count V alleges Defendants are liable for the wrongful death of Mitchell under Alabama law. *Id.* at 7.

Early on, the City moved to dismiss Count Five against it due to Plaintiff's noncompliance with Alabama Code § 11-47-23 ("All claims against the municipality … shall be presented to the clerk for payment within two years from the accrual of said claim or shall be barred. Claims for damages growing out of torts shall be

---

[2] Although Palmer was originally named as a defendant in this matter, he has since been dismissed by joint stipulation of the parties. (Doc. 85).

presented within six months from the accrual thereof or shall be barred.") and § 11-47-192 ("No recovery shall be had against any city or town on a claim for personal injury received, unless a sworn statement be filed with the clerk by the party injured or his personal representative in case of his death stating substantially the manner in which the injury was received, the day and time and the place where the accident occurred and the damages claim.") (Doc. 9). The Court granted the motion and dismissed Count Five inasmuch as it applied to the City. (Doc. 21). Defendants now move for summary judgment on the remaining counts. The parties having fully briefed the issues, this matter is ripe for consideration.

## II. MOTION TO STRIKE

Before addressing the substantive issues of Defendants' summary judgment motions, it is necessary to decide the joint motion to strike Plaintiff's expert report filed by Defendants. (Doc. 98). Defendants offer three bases to strike the expert report of retired Judge LaDoris Cordell. First, Defendants contend that the expert report of retired Judge Cordell does not comply with the basic requirements of an affidavit or declaration and, therefore, is improper. *Id.* at 1. Second, Defendants contend that expert reports are inadmissible at the summary judgment stage. *Id.* at 2. Third, Defendants contend that the expert report of retired Judge Cordell is untimely under the Federal Rules of Civil Procedure and, therefore, inappropriate evidence upon which she may overcome summary judgment. *Id.* Furthermore, Defendants argue that, due to her untimely disclosure, Plaintiff should be barred from calling retired Judge Cordell as an expert witness should this matter proceed

to trial. *Id.* at 7. Plaintiff filed no response to Defendants' motion. Since this issue can be decided on Defendants' first and third bases, the Court does not address Defendants' contention that expert reports are inadmissible at the summary judgment stage.

Federal Rule of Civil Procedure 26(a)(2) "requires a party to disclose to the other parties the identity of any expert witness it may use at trial to present evidence and '[e]xcept as otherwise stipulated or directed by the court, this disclosure [must] … be accompanied by a written report—prepared and signed by the witness.'" *OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 1360–61 (11th Cir. 2008) (citing Fed. R. Civ. P. 26(a)(2)). Disclosure of the expert report must comply with "the times" and "the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Compliance with a set deadline is necessary because "the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." *Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006).

If a party fails to make expert disclosures in accordance with a court's order, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). Substantial justification is "justification to a degree that could satisfy a reasonable person that parties could differ as to whether

the party was required to comply with the disclosure request." *Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 682 (M.D. Fla. 2010). A failure to timely make the required disclosures is harmless when there is no prejudice to the party entitled to receive disclosure. *Id.* at 683. The party failing to comply with Rule 26(a) bears the burden of establishing that its nondisclosure was either substantially justified or harmless. *Id.* It is within a court's discretion to preclude a party from relying on an expert's report to overcome summary judgment and preclude said expert from testifying at trial when the party fails to comply with Rule 26(a)(2) or carry its burden under Rule 37(c)(1). *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008).

Here, the original scheduling order required Plaintiff provide any expert disclosure to Defendant no later than April 22, 2016. (Doc. 32, p. 2). Upon motion by Plaintiff (Doc. 54), the Court extended the initial deadline to allow Plaintiff to file any expert disclosure no later than July 22, 2016 (Doc. 58, p. 1). Just three days prior to this extended deadline, Plaintiff again moved for an extension of, among other things, her expert report disclosure deadline due to medical issues her counsel faced. (Doc. 71). The Court extended Plaintiff's Rule 26(a)(2) deadline until September 30, 2016, concluding that such a deadline was sufficient for Plaintiff to disclose any expert report for any expert Plaintiff had presumably garnered. (Doc. 72, p. 2). Indeed, it at least appears, based upon Defendants' representation, that Plaintiff had already garnered retired Jude Cordell as an expert witness as far back as December 2015 since her initial discovery disclosure listed retired Judge Cordell as an expert witness. (Doc. 98, p. 4 n.1). However, Defendants note all Plaintiff

provided was the expert's name and curriculum vitae. *Id.* Plaintiff disclosed, at that time, retired Judge Cordell had yet to reach a final opinion. *Id.*

Defendants state that September 30, 2016, came and went with no expert disclosure by Plaintiff. (Doc. 98, p. 3). It was not until Plaintiff filed her response to Defendants' motions for summary judgment that she provided retired Judge Cordell's expert report, approximately ten weeks after the September deadline. (Doc. 93-3, pp. 1–14). Plaintiff cannot show reasonable justification for missing the September deadline. Her awareness of her required disclosure compliance is evidenced by the fact that she requested the deadline be extended on two separate occasions. *See Hewitt*, 268 F.R.D. at 682. Additionally, Plaintiff's untimely expert disclosure cannot be said to be harmless or render no prejudice upon Defendants. It was reasonable for Defendants to move for summary judgment with the expectation Plaintiff abandoned any intentions to rely on expert evidence given she failed to meet the necessary deadline. But now, Plaintiff attempts to refute Defendants' position based upon an expert conclusion Defendants were afforded no opportunity to cross-examine or refute.[3] Moreover, several months have passed since Defendants moved to strike retired Judge Cordell's expert report and Plaintiff has offered no basis for the Court to extend its September 30, 2016, deadline. Therefore, the Court finds Plaintiff failed to show that its nondisclosure was either substantially justified or harmless.

Moreover, even if the report were timely, its still suffers another shortcoming.

---

[3] The Court notes that Plaintiff's expert report came just days before Defendants' expert disclosure deadline.

A review of the report provided shows it neither names nor is signed by the author, (presumably Judge Cordell). The only indication that retired Judge Cordell authored the report is Plaintiff's table of contents to her evidentiary material provided in opposition to summary judgment. (Doc. 92, p. 2). Therefore, the Court concludes that Plaintiff's expert report fails to comply with the minimum content requirements of Rule 26(a)(2). Given this, the Court **GRANTS** the motion to strike the expert report of retired Judge LaDoris Cordell filed by Defendants. The report will not be considered in deciding the present motion, nor would retired Judge LaDoris Cordell be permitted to testify if this matter were to proceed to trial.

### III. FACTUAL BACKGROUND[4]

The shooting in question occurred during the pre-dawn hours of September 6, 2013, at the home of Kevin and Yansean Frye, located at 785 Bonneville Drive, Mobile, Alabama. That date was not Mitchell's first time at the Frye residence. And Mitchell was no stranger to the Fryes. During most, if not all, of Mitchell's childhood, Mrs. Frye was married to Mitchell's uncle, Marion Malley, and Mitchell would regularly visit the Frye residence in order to spend time with his cousin M.J., Mrs. Frye's son. (Doc. 81-3, pp. 5–6). But M.J. grew up and moved out. Mitchell struggled to understand that his cousin no longer resided at the Bonneville Drive home. For instance, in May 2013, Mitchell appeared, uninvited, at the Frye residence looking for M.J. Mr. Frye attempted to explain to Mitchell that M.J. no

---

[4] The Court reiterates all relevant facts as contained in the parties' evidentiary submissions. Where a fact is in dispute, it is portrayed in the light most favorable to Plaintiff.

longer resided there and requested he leave.  Mitchell, however, refused the request.   Not wanting an altercation, Mr. Frye called for police assistance in having Mitchell removed from the premises.  (Doc. 81-2, pp. 5–7).

On the morning in question, Mr. Frye awoke due to shoulder pain, got out of bed, and went to take a pain reliever.  (Doc. 81-2, pp. 18–19).  While trying to find relief for his shoulder, Mr. Frye heard what sounded like someone trying to open his front door.  *Id.* at 4, 17.  Upon looking out the picture window to the left of the front door when facing the house, Mr. Frye saw Mitchell standing on his front porch with a knapsack-type bag over his shoulder.  *Id.* at 17.  Mitchell did not knock or announce his presence.  Instead, Mr. Frye watched Mitchell turn, walk off the porch, and begin making his way to the back of the Frye residence.  *Id.*  Mr. Frye followed Mitchell's progress window-to-window until Mitchell reached Mr. Frye's backyard.  Once in the backyard, Mitchell sat down in a corner by the air conditioning unit.  *Id.* at 18.  Mr. Frye woke his wife and asked her to "call somebody to come get" Mitchell.  *Id.*

Fearing Mitchell's presence, Mrs. Frye called Mitchell's aunt who in turn tried to contact Plaintiff but was unable to do so.  (Doc. 81-3, pp. 11–12).  When questioned about why she feared Mitchell, Mrs. Frye explained that she thought Mitchell "had lost his mind" and kept coming back to her house uninvited.  (Doc. 81-3, p. 10; Doc. 92-2, p. 2; Doc. 92-3, p. 3).  Mrs. Frye explained that Mitchell had not exhibited this mental problem as a child but, later in life, "went somewhere and came back" not the same.  (Doc. 81-3, p. 10; Doc. 92-2, p. 3).

After Ms. Frye was unable to reach Mitchell's mother, she called the Mobile Police Department ("the MPD"). She informed the MPD dispatcher that a man was on her property whose "mind took a leave of absence" and requested an officer "come get him to leave." (Doc. 81-3, p. 12). At approximately 4:30 a.m. September 6, 2013, Chandler was dispatched as the primary unit responding to Mrs. Frye's call, and Wilson was dispatched as the backing unit. (Doc. 81-4, pp. 6, 20). Being less than a mile from the Frye residence, Chandler was the first officer on scene. *Id.* at 5. Pulling up to the Frye residence, Chandler made contact with Mrs. Frye, who informed him of the situation, Mitchell's location, and discussed Mitchell's mental issues with Chandler. (Doc. 81-4, p. 7; Doc. 81-3, pp. 14, 34). Although Mitchell's "mind took a leave of absence" and he needed to be probated, Mrs. Frye explained that Mitchell had not disturbed or harmed anyone. (Doc. 81-3, pp. 14, 15, 34). But Mitchell scared Mrs. Frye, so she wanted the officers to remove Mitchell from her property. *Id.* at 16.

Chandler informed Mrs. Frye the best he could do is arrest Mitchell for trespassing if she was willing to sign for a trespassing warrant with the magistrate. (Doc. 81-3, p. 35; Doc. 92-3, pp. 3, 19). To this Mrs. Frye agreed. (Doc. 81-3, p. 35). Chandler testified that, at this point, he felt he had to arrest Mitchell for trespassing. (Doc. 81-4, pp. 18–19). Wilson arrived at the Frye residence sometime during this exchange between Chandler and Mrs. Frye, which lasted approximately one and a half minutes. As the two officers made their way to the back of the Frye residence, Chandler informed Wilson that they were dealing with a potential Signal

31, which is the MPD's code for someone with mental problems.  *Id.* at 17–18.

    As of the date in question, the MPD had in place Memorandum Order MO-2011-03 to "enhance an officers' ability to recognize, understand and deal with a person with mental illness."  (Doc. 81-8, p. 17).  The memorandum order advises officers to gather as much information as possible about the individual's mental issue, "events that may have precipitated the person's behavior, and the presence of weapons."  *Id.*  Such information can be obtained from "the subject, their family members, neighbors, prior involvement, etc."  *Id.*  The memorandum order guides officers in the best practice "dos and don'ts" for approaching and interacting with a person with mental illness.  *Id.* at 17–18.  Although the memorandum order provides a list of symptoms persons with mental illness may demonstrate, the information provided is merely a guideline.  *Id.* at 20.  Police officers are "not expected to identify or diagnose specific mental disorders," and such function should be left to proper medical professionals.  *Id.* at 19–20.  Additionally, as Chief of Police James Barber explained, "[T]here are times when force must be employed in order to place a suspect under arrest, regardless of whether that suspect may be mentally ill or emotionally disturbed."  *Id.* at 5–6.

    Chandler and Wilson cautiously made their way to the back of the Frye residence.  (Doc. 81-4, pp. 22, 24; Doc. 81-5, p. 7).  The officers located Mitchell ducked down in the corner of the house.  *Id.*  Mitchell was only visible from shoulders up due to a barbeque grill blocking their view.  *Id.*  The pair of officers identified themselves as police.  (Doc. 81-2, p. 25).  Wilson asked Mitchell what he

was doing behind the Frye's house, to which Mitchell responded, "These my kinfolks." (Doc. 81-5, p. 22). Chandler asked Mitchell to raise his hands, and Mitchell raised his hands and stood up. (Doc. 81-4, p. 24). Chandler described Mitchell's facial expression as one of fear or panic, as if he had taken some substance that causes a stupor, under the influence of alcohol, or just committed a crime and been caught. *Id.* at 12.

Wilson informed Mitchell that the officers were going to pat him down for weapons in order to secure the safety of the officers and Mitchell. (Doc. 81-5, p. 23). In response, Mitchell again responded, "These my kinfolks." *Id.* As the officers approached, Chandler began patting down Mitchell's right side and Wilson Mitchell's left. *Id.* at 10, 12. Chandler removed a knife clipped to Mitchell's front right pocket he had earlier identified and placed it out of reach on the barbeque. (Doc. 81-4, p. 2). Mitchell was to be placed under arrest after the pat down for weapons was complete. *Id.* at 40. But almost as quick as the pat down began, Mitchell took off running northerly before either officer completed the pat down. (Doc. 81-4, p. 31; Doc. 81-5, p. 13). When Mitchell made it to the corner of the house, he turned westerly and began running out the Frye driveway toward Bonneville Drive. Up to the point he ran, Wilson described the encounter with Mitchell as lasting no more than thirty seconds. (Doc. 81-5, p. 24).

Both Chandler and Wilson pursued Mitchell out the Frye driveway then north on Bonneville Drive when Mitchell turned and ran right as he exited the driveway. (Doc. 81-4, p. 35; Doc. 81-5, p. 13). As they pursued Mitchell, Wilson led

the two officers with Chandler some feet behind. (Doc. 81-4, p. 35). Before exiting the driveway, Wilson unholstered her Taser as she ran and fired upon Mitchell in an attempt to subdue Mitchell but missed. (Doc. 81-4, p. 35; Doc. 81-5, p. 15).

The MPD utilizes and provides qualified officers with a Taser manufactured by Air Taser International. (Doc. 81-8, p. 8). An officer may carry one of two models, which have slight differences, but both function in the same two modes. (Doc. 81-7, p. 3). One mode fires from a cartridge attached to the Taser two projectiles with prongs connected to twenty-one feet of lead wire. *Id.* The projectiles are intended to attach to the target's clothing or skin. If both projectiles properly attach, this mode incapacitates the target by interfering with the target's central nervous system for the skeletal muscles between where the two projectiles land. *Id.* at 4. The second mode is referred to as "drive stun" or "touch tase." The touch tase mode is a pain compliance mode that only affects the area touched. *Id.* at 4–5. In either mode, the Taser cycles for five seconds, "unless manually stopped or the trigger is held." *Id.* at 4. The MPD maintains its own police academy to provide training for its officers. (Doc. 81-8, p. 3). Each officer, including the two in question, learns minimum standards of policing, as well as the use of force. *Id.* This training includes the proper use of an electronic control device or Taser and Memorandum Order No. 2010-01, dated January 26, 2010, which addresses the use of Tasers and reporting of their use. *Id.* at 8–16. The use of a Taser constitutes use of force. *Id.* at 12. A Taser may be used by an officer when, among other considerations, "the officer reasonably believes the suspect is a credible threat," the

"suspect actively resist[s] arrest," or the "[c]ircumstances are tense, uncertain, and rapidly evolving." *Id.*

About the time Mitchell was running down the driveway, Officer Patrick Palmer arrived and began getting out of his patrol car to offer any assistance necessary, although he was not specifically dispatched to Bonneville Drive. Before getting far from his patrol car, Palmer saw Mitchell run down the driveway and turn north on Bonneville Drive, all the while being chased by Chandler and Wilson, one of which was yelling for Mitchell to stop. (Doc. 81-6, p. 6; Doc. 93-1, p. 16). Palmer got back in his patrol car, which was facing south, turned around and began pursuing Mitchell, Wilson, and Chandler north on Bonneville Drive until he cut Mitchell off at the next street to his right, Pawnee Circle. (Doc. 81-6, pp. 8–9; Doc. 93-1, p. 16). Unable to continue north, Mitchell turned up another driveway and doubled back south, now running through yards with Wilson and Chandler continuing their foot pursuit. (Doc. 81-4, p. 41; Doc. 81-5, pp. 20, 21, 26; Doc. 81-6, p. 9).

Chandler had fallen behind Mitchell and Wilson and was far enough back to see Mitchell running back his way. Chandler had already unholstered his Taser, and, at this point, Chandler fired at Mitchell as he ran by but missed. (Doc. 81-4, pp. 39, 44, 47). Mitchell continued his southerly trek back toward the Frye residence. *Id.* As Chandler fired his Taser, he tripped and fell on his own Taser wires, momentarily tasing himself. *Id.* at 50.

From their front porch, the Fryes saw Mitchell running back toward their

house.  (Doc. 81-3, p. 15).  Seeing the chase headed their way, both Mr. and Mrs. Frye made their way inside their house and locked the door behind them.  (Doc. 81-2, p. 13; Doc. 81-3, p. 16).  Mitchell ran back to the Frye's front porch.  The Fryes testified that Mitchell attempted to open their door when he ran back onto their porch.  (Doc. 81-2, p. 27; Doc. 81-3, p. 17).

Wilson and Palmer pursued Mitchell to the Frye front porch.[5]  Both officers explained that they attempted to place Mitchell in handcuffs, but Mitchell actively resisted their efforts and commands to get down with his hands behind his back.  (Doc. 81-6, p. 15).  Wilson described Mitchell as "ripping" his arms away when she tried to pull them behind his back and handcuff him.  (Doc. 81-5, p. 32; Doc. 92-3, p. 10).  At some point in the front porch fracas, Wilson touch tased Mitchell at least one time due to his noncompliance.  (Doc. 81-5, p. 34).  Aware of Mitchell's noncompliance, Palmer testified that he attempted to get Mitchell's left arm behind his back but could not because Mitchell was too strong.  (Doc. 81-6, pp. 15–17, 19–20).  Palmer wrapped Mitchell in a bear hug around the last time Wilson tased Mitchell on the porch and the three fell into the bushes to the right of the porch when facing the Frye residence.  (Doc. 81-5, p. 34; Doc. 81-6, p. 20).  When Palmer fell into the bushes, he could feel the effects of a Taser but was unaware who had the Taser.  (Doc. 81-6, p. 28).  Wilson heard Palmer's voice but was unaware of his location.  (Doc. 81-5, pp. 36–37).

---

[5] Although Palmer testified that Wilson was the first officer on the porch, Mr. Frye testified that Palmer was the first officer on the porch. *Compare* (Doc. 81-6, p. 12) *with* (Doc. 81-2, p. 14). This distinction, however, is immaterial to explaining the context of the situation that unfolded.

Mr. and Mrs. Frye watched the front porch fracas between Mitchell, Wilson, and Palmer through their front porch picture window. Mrs. Frye described Mitchell as "uncontrollable" to investigators after the incident. (Doc. 92-2, p. 8). Although uncontrollable, she described Mitchell's resistance and noncombative and more an effort to avoid being held by officers. (Doc. 81-3, pp. 25, 58; Doc. 92-3, p. 4). Both Mr. and Mrs. Frye heard the officers commanding Mitchell to get on his knees with his hands behind his back. (Doc. 81-2, p. 14; Doc. 81-3, p. 18; Doc. 93-2, p. 12). And Mr. Frye described the front porch fracas differently from Wilson and Palmer. He testified that Palmer had Mitchell on his knees about to handcuff Mitchell when Wilson tasered Mitchell. (Doc. 81-2, pp. 14, 30, 31). Mr. Frye explained that Wilson tasered Mitchell after telling him to get down and put his hands on his head. *Id.* at 30. After being tased, Mitchell stood up and the three fell into the bushes. *Id.* at 31–32. When Mitchell, Wilson, and Palmer fell off the porch into the bushes, Mr. and Mrs. Frye could not see the remainder of the incident, except for Palmer for a brief moment. (Doc. 81-2, p. 15; Doc. 81-3, pp. 23, 30).

Chandler made his way up to the Frye residence not long before Mitchell, Wilson, and Palmer fell into the bushes. As he approached, Chandler saw Palmer wrap Mitchell up in a bear hug. (Doc. 81-4, pp. 52–53). Chandler observed the clump of people wrestling in the bushes but was unable to make out who was who until he got closer, whereupon he saw Mitchell on top of Wilson and Palmer on his side. *Id.* at 57–58. When Palmer fell, his protective vest was pushed up over his head, which forced him to let go of Mitchell. (Doc. 81-6, p. 24). This forced Palmer

on his side away from Mitchell and Wilson. Palmer was unable to see what was going on until he untangled himself from the bushes and removed his vest. *Id.* With Mitchell on top of her, Wilson attempted to tase Mitchell since she still held her Taser in her right hand. (Doc. 81-5, pp. 40). Wilson's attempts were unsuccessful because her right arm was trapped "between [Mitchell], the bushes, and the house, it was lodged." *Id.* Chandler described Mitchell and Wilson at this point as "wrestling with each other" but not seeing Mitchell punch or kick anyone. (Doc. 81-4, p. 59). Wilson explained that she felt elbows and arms hitting her but cannot say whether the hits were deliberate. (Doc. 81-5, pp. 44–45).

Trapped under Mitchell, Wilson lost control of her Taser, someone picked it up, and she "quickly felt the Taser on [her] arm." (Doc. 81-5, pp. 51, 68, 69). While under the Taser's affects, Wilson explained she did not know what was happening and was physically immobilized except for some shaking. *Id.* at 67, 69. Chandler saw that Mitchell had his left arm wrapped around Wilson's waist or stomach and had "her Taser in his hand and had it stuck to her." (Doc. 81-4, p. 60). Chandler could not see if Mitchell was pulling the Taser trigger but thought Wilson was acting like she was being tased. *Id.* About this time, the Fryes heard Wilson scream in pain while they were inside their house. (Doc. 81-2, p. 16; Doc. 81-3, p. 29). Chandler attempted to pull Wilson away from Mitchell but was himself shocked so he stepped two to three feet away and drew his handgun. (Doc. 81-4, p. 61). Chandler explained that all of this happened very fast. *Id.* at 62.

After Chandler backed away, Mitchell got off Wilson and moved away from

the officers. The exact distance Mitchell moved away is unknown, but Mitchell made his way south, away from Chandler, Wilson, and Palmer. (Doc. 81-4, p. 66) (Chandler testifying that Mitchell took seven to eight steps, which put him approximately fifteen to twenty feet away); (Doc. 81-5, p. 49) (Wilson testifying that there was eight to ten feet between herself and Mitchell when she got out of the bushes). At this point, Mitchell turned to face the three officers with Wilson's Taser in his hand. (Doc. 81-4, p. 66; Doc. 81-5, p. 51; Doc. 81-6, p. 28). Both Chandler and Palmer described Mitchell's stance as aggressive. (Doc. 81-4, p. 66; Doc. 81-6, p. 54). Palmer drew his Taser. (Doc. 81-5, p. 59; Doc. 81-6, pp. 31–32). In another attempt to subdue Mitchell, Palmer fired his Taser upon Mitchell. Palmer testified that Mitchell "did lower himself down and turn left," as if struck, after Palmer fired his Taser, but Mitchell "then came back up." *Id.* at 33.

Both Chandler and Wilson testified that they ordered Mitchell to "drop the Taser." (Doc. 81-4, p. 70; Doc. 81-5, p. 60). Wilson drew her handgun as she ordered Mitchell to "drop the Taser." (Doc. 81-5, p. 60). At this time, Mitchell had Wilson's Taser pointed at Wilson's center mass. (Doc. 81-4, p. 68; Doc. 81-5, p. 57). Chandler and Wilson testified that they again ordered Mitchell to "drop the Taser." (Doc. 81-4, pp. 69–70; Doc. 81-5, p. 60). Conversely, the Fryes testified that Chandler and Wilson gave no commands to Mitchell prior to firing their handguns. (Doc. 81-2, p. 36; Doc. 91-2, p. 10; Doc. 92-3, p. 4). Palmer testified that he only remembered Chandler using the word "transition" in some manner immediately before the shooting. (Doc. 81-6, pp. 30–31). But Palmer explained that he had just

gotten out of the bushes and was trying to figure out what was happening. *Id.*

Taser still in hand, Mitchell moved toward Wilson. Chandler described Mitchell's movement as "two fast steps as if you're going to take off to catch a pass in football." (Doc. 81-4, p. 70). In other words, "[a] rapid push-off step forward, followed by a second step." *Id.* Wilson described Mitchell's movement as "a pretty brisk walk" from eight to ten feet away with the Taser pointed at her. (Doc. 81-5, p. 61, 63). Palmer described Mitchell's movement as his upper body was moving but his feet and legs were stationary. (Doc. 81-6, p. 32). And Mitchell was out of the view of Mr. and Mrs. Frye at this point. Chandler fired his handgun one time, and Wilson fired her handgun three times. (Doc. 81-4, p. 72; Doc. 81-5, p. 63). Wilson testified that Mitchell was approximately four to six feet away after her third shot. (Doc. 81-5, pp. 64–64). Mitchell fell to the ground after being shot, and Chandler kicked Wilson's Taser from Mitchell's hand. (Doc. 81-3, p. 73). The officers called for medical assistance for Mitchell, but, tragically, he died.

General Order #1 of the MPD addresses when an officer may use deadly force. Therein, the order explains that "[o]fficers are expected to achieve control, and to the extent possible, exhaust other reasonable means before resorting to the use of deadly force." (Doc. 81-8, p. 27). An officer has probable cause to use deadly force when, among other circumstances, (1) "[t]he subject possesses a weapon or is attempting to gain access to a weapon under circumstances indicating an intention to use it against the officer or citizens" or (2) "[a] subject with the capability of inflicting death or serious injury—or otherwise incapacitating the officer—without a

18

deadly weapon is demonstrating an intention to do so." *Id.* The order further instructs that officers shall provide a verbal warning "of the intent to use deadly force" when circumstances permit. *Id.*

Mitchell's autopsy indicates his cause of death was two gunshot wounds, one to his chest and one to his torso. (Doc. 81-1, p. 3). A forensic analysis was performed on the bullets recovered from Mitchell's body. The analysis, however, was unable to match the bullets recovered to either Chandler's or Wilson's gun "due to insufficient corresponding individual microscopic characteristics." *Id.* at 10.

## IV. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential

element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, at *2 (11th Cir. 2011).  In reviewing whether a non-moving party has met its burden, the Court must draw all justifiable inferences in favor of the non-moving party.  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 – 99 (11th Cir. 1992) (citations omitted).  Thus the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## V. ANALYSIS

### A. Federal Claim Against Chandler and Wilson (Count I)

Pursuant to Title 42, United States Code, Section 1983, Plaintiff alleges Chandler and Wilson unreasonably and unnecessarily used deadly force in violation of Mitchell's "rights protected by the Fourth, Fifth, and/or Fourteenth Amendments of the United States Constitution."  (Doc. 1, p. 5).  Section 1983 promulgates, in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and its
> laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

## 1. Official Capacity Claim

Plaintiff does not specify whether Count I is against Chandler and Wilson in their official capacity only, individual capacity only, or both official capacity and individual capacity. *See* (Doc. 1, p. 5). Plaintiff's response to Defendants' motions offers no clarification. Chandler and Wilson argue that summary judgment is due in any respect that Plaintiff brought suit against them in their official capacity. The Court agrees.

In *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991), the Eleventh Circuit explained that suit against a municipal officer in his or her official capacity is redundant of a suit against the city for whom the municipal officer works:

> Because suits against a municipal officer sued in his official capacity
> and direct suits against municipalities are functionally equivalent,
> there no longer exists a need to bring official-capacity actions against
> local government officials, because local government units can be sued
> directly (provided, of course, that the public entity receives notice and
> an opportunity to respond).

*Id.* at 776 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (internal footnote omitted). Plaintiff offers no reason to deviate from this well-settled principle. Thus, insofar as Count I brings suit against Chandler and Wilson in their official capacity, the Court **GRANTS** summary judgment.

## 2. Individual Capacity Claims

### a. Fifth Amendment and Fourteenth Amendment Claims

As noted above, Plaintiff alleges that Chandler and Wilson unreasonably and unnecessarily used deadly force against Mitchell in violation of the Fifth Amendment and Fourteenth Amendment. (Doc. 1, p. 5). Chandler and Wilson counter that any excessive force claim sounding in the Fifth Amendment or Fourteenth Amendment is due to be dismissed because neither guides the Court's decision in this matter. (Doc. 80, p. 4). Indeed, an excessive force claim—deadly or not—arising out of the events surrounding an arrest is analyzed under the rubric of the Fourth Amendment. *Fennell v. Gilstrap*, 559 F.3d 1212, 1215 n. 4 (11th Cir. 2009). Plaintiff's excessive force allegation addresses acts surrounding Mitchell's arrest, not post-arrest acts. Thus, the Fourteenth Amendment is inapplicable.[6] *Garrett v. Athens-Clarke Cnty., Ga.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004) (rejecting the opportunity to analyze an excessive force claim arising out of events occurring during the course of an arrest under the rubric of the Fourteenth Amendment).

Further, Plaintiff's excessive force claim seeking relief based on the Fifth Amendment finds no support in the law. The Fifth Amendment is a limitation on the powers of the federal government. *See Davidson v. City of New Orleans*, 96 U.S. 97, 99 (1877); *Bey v. Abrams*, No; 7:14-cv-02205-RDP, 2015 WL 3839908, at *10

---

[6] To the extent Plaintiff may assert the Fourteenth Amendment for the proposition that the Fourth Amendment applies to the several states and its actors under the doctrine of selective incorporation, the Court agrees. *See Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1295 n.53 (11th Cir. 2007).

(N.D. Ala. June 22, 2015) (concluding that Fifth Amendment claims are due to be dismissed when brought against state or municipal actors, not the federal government); *Sweatt v. Bailey*, 876 F. Supp. 1571, 1582 (M.D. Ala. 1995) (same); *see also Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997) (noting that "[t]he Fifth Amendment obviously does not apply [w]here [ ] the acts complained of were committed by state rather than federal officials"). Plaintiff's complaint names only municipal actors, employees, or entities, not federal agents or entities. Thus, the Court finds Plaintiff's Fifth Amendment and Fourteenth Amendment claims have no basis in law and **GRANTS** Chandler's and Wilson's motions insofar as Count I brings suit under either amendment.

### b. Fourth Amendment Claim

Pursuant to § 1983, Plaintiff asserts that Chandler's and Wilson's use of deadly force was unreasonable and unnecessary under the Fourth Amendment. To this, Chandler and Wilson respond they are due qualified immunity. (Doc. 80, p. 5; Doc. 75, p. 5). Plaintiff counters that *Tennessee v. Garner*, 471 U.S. 1 (1985), clearly established a person's constitutional right to be free from deadly force when he or she poses "no threat of death or serious bodily harm to anyone." (Doc. 89, p. 19). Plaintiff further argues that Mitchell posed no threat of harm to the officers or anyone else; that; that objectively reasonable officers would have known the use of deadly force against Mitchell was unconstitutional, and, therefore, Chandler and Wilson are not due qualified immunity. *Id.*

In civil rights actions brought under § 1983, the doctrine of qualified

immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit applies a multi-step, burden shifting qualified immunity analysis:

> In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred…. Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.

*Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citations omitted).

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Responding to a scene after being dispatched to a location based on a complaint is a legitimate job-related function within an officer's discretionary authority. *Byrd v. Wicke*, No: 09-cv-00403-KD-M, 2010 WL 11252497, at *5 (S.D. Ala. Nov. 2, 2010). An arrest is a legitimate job-related function within an officer's discretionary authority. *Rogers v. City of Selma*, 178 F. Supp. 3d 1222, 1236 (S.D.

Ala. 2016).  The means and method of arrest, including the use of force, are also recognized as discretionary decisions for Alabama law enforcement officers.  *See City of Birmingham v. Sutherland*, 834 So. 2d 755, 762 (Ala. 2002) (finding an officer's decision to make a warrantless arrest and the officer's determination as to "the manner in which he would effect the arrest" is discretionary).

Both Chandler and Wilson were dispatched to the Frye residence in response to Mrs. Frye's call.  Once Mrs. Frye agreed to sign a complaint for trespass against Mitchell, Chandler testified that they had to place Mitchell under arrest at that point, regardless of who first mentioned signing the trespass complaint.  (Doc. 81-4, pp. 18–19).  It was within Chandler and Wilson's power to decide how to complete the arrest.  Therefore, Chandler and Wilson were acting within their discretionary authority on September 6, 2013.

Having shifted the burden to Plaintiff, the question becomes whether Plaintiff's allegations, taken as true, establish a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Finally, "the plaintiff must show that the violation was 'clearly established.'"  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  Plaintiff must establish both of these elements in order for Chandler and Wilson to be denied qualified immunity.  *See Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010).  The Court may analyze this two-pronged analysis in whatever order it deems best.  *Id.*

### (i) Whether a constitutional violation occurred.

Plaintiff's claim, at its essence, is that Chandler and Wilson violated

Mitchell's Fourth Amendment right to be free from unreasonable seizure. *See Lee*, 284 F.3d at 1197. But "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, the level of force applied must not exceed that which a "'reasonable officer would believe … is necessary in the situation at hand.'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (quoting *Lee*, 284 F.3d at 1197).

The Fourth Amendment's "objective reasonableness" standard supplies the test to determine whether the use of force, including deadly force, was excessive. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009). Accordingly, courts must "careful[ly] balanc[e] … the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The Eleventh Circuit distilled from Supreme Court jurisprudence several factors to help "slosh … through the factbound morass of [this] 'reasonableness'" analysis. *Scott v. Harris*, 550 U.S. 372, 383 (2007). In particular were three factors from *Graham v. Connor*:

> The analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] … actively resist[ed] arrest or attempt[ed] to evade arrest by flight.

*Crenshaw*, 556 F.3d at 1290 (internal citation omitted). A mechanical application of these factors, however, is inappropriate. *See Scott*, 550 U.S. at 383. Instead, courts

must be carful to evaluate the reasonableness of an officer's conduct "on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396), *modified*, 14 F.3d 583 (11th Cir. 1994). Further, the Supreme Court cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

The use of deadly force indisputably implicates weighty individual interests. *See Garner*, 471 U.S. at 9. For over thirty years, *Tennessee v. Garner* has guided courts' Fourth Amendment reasonableness analyses where officers used deadly for. The Supreme Court, however, has explicitly cautioned against an interpretation of *Garner* as "a magical on/off switch that triggers rigid protections whenever an officer's actions constitute 'deadly force.'" *Scott*, 550 U.S. at 382. Instead, "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation." *Id.* (citation omitted). Accordingly, the use of deadly force may more likely be reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using

deadly force. *See Garner*, 471 U.S. at 11–12. Again, none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect. *Scott*, 550 U.S. at 382.

To satisfy the objective reasonableness standard imposed by the Fourth Amendment, Chandler and Wilson must establish that the countervailing government interest was great. *See Crenshaw*, 556 F.3d at 1290. As noted above, analysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether Mitchell posed an immediate threat to the officers or others; and (3) whether Mitchell actively resisted arrest. *See id.*

Before delving into these factors, it is necessary to address Plaintiff taking Defendants to task for the fact no non-police witness can testify as to what Chandler, Wilson, Palmer, and Mitchell did in the seconds before Mitchell was shot. *See* (Doc. 89, p. 23). As explained above, neither Mr. Frye nor Mrs. Frye could see the substance of what transpired in their yard after Wilson, Palmer, and Mitchell fell into the bushes. Given this, Plaintiff contends, the Court should follow the holding in *Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2015), and analogous cases. *Id.* Under *Flythe*, the inconsistencies in the officers' statements cast a dark cloud on their "credibility," and, therefore, the Court must "reject as untrue[ ] the conduct attributed to [ ] Mitchell by the officers." *Id.* at 17. More specifically, the Court should reject that Mitchell was combative or ever had Wilson's Taser.

The Court finds *Flythe* unavailing because it is factually distinguishable. In

that case, the court reasoned, "[W]here the witness most likely to contradict [the officer's] story—the person [he] shot dead—is unable to testify, courts … may not simply accept what may be a self-serving account by the police officer." *Flythe*, 791 F.3d at 19 (citation omitted). "Instead, courts must carefully examine all the evidence in the record … to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* (citation omitted) (ellipsis in original). The *Flythe* court found multiple inconsistencies in comparing the officer's account and eyewitnesses' accounts, of which one inconsistency was material. The officer testified that the suspect attacked him with a raised knife. *Id.* at 20. However, eyewitnesses all testified that the suspect had no knife. The court chose to reject the officer's testimony regarding the presence of the knife in its evaluation of whether the officer acted reasonably under the Fourth Amendment. *Id.* at 22.

The Court has evaluated the record evidence in this case and, ever mindful of the light it must view the evidence, finds unpersuasive Plaintiff's alleged inconsistencies. The record evidence is consistent in the fact that (1) Mitchell refused to allow officers to complete a pat down for weapons; (2) Mitchell ran from the officers; (3) Mitchell failed to follow orders and allow officers to place him in handcuffs; (4) Mitchell obtained Wilson's Taser and used it against her; (5) Mitchell faced off with the officers with Wilson's Taser in his hand; and (6) Mitchell advanced toward the officers with Wilson's Taser in hand.

The Court does note, as Plaintiff points out, there are minimal variances between the officers' accounts but none that rise to the level Plaintiff insists. For

instance, Wilson testified that Mitchell was approximately ten feet away when he started toward her at a brisk walk, Taser in hand. (Doc. 81-5, p. 61, 63). Chandler described this movement by Mitchell as "two fast steps as if you're going to take off to catch a pass in football." (Doc. 81-4, p. 70). In other words, "[a] rapid push-off step forward, followed by a second step." *Id.* at 72.[7] Palmer explained that Mitchell took an aggressive stance and attempted to move toward the officers. (Doc. 93-2, p. 5). By moving, Palmer explained that Mitchell's upper body and arms were moving but his feet were stationary. *Id.* The fact that minor variances exist between these descriptions is inconsequential. "[T]he [C]ourt finds that the differences result primarily from the officers' different perceptions during an intense encounter that happened in a matter of seconds." *Byther ex rel. Byther v. City of Mobile*, 398 F. Supp. 2d 1222, 1237 (S.D. Ala. 2005). And unlike *Flythe*, there is no testimony or evidence contradicting material points, such as whether Mitchell in fact had possession of Wilson's Taser or advanced on the officers. Instead, "the officers' statements and testimony are consistent as to the most important facts." *Byther*, 398 F. Supp. 2d at 1237. Thus, the Court declines to reject the officers' accounts in evaluating the present motion.

---

[7] Plaintiff also attempts to create an internal inconsistency between Chandler's account of Mitchell's movement days after the shooting to investigators and his deposition testimony several years later. *See* (Doc. 89, p. 11). The Court reviewed both statements and finds Plaintiff's attempt unpersuasive. In his statement to investigators, Chandler describes how Mitchell released Wilson, stood up from the bushes, and took five steps to the right (into the Frye front yard). (Doc. 92-3, p. 25). Chandler was not in this instance describing Mitchell's movements toward Wilson that initiated the use of deadly force but describing Mitchell's movements moments before.

Returning to the *Crenshaw* factors, the Court finds that the first factor weighs in Mitchell's favor. The crime in question was the nonviolent misdemeanor of trespass. But even though "this crime was not severe, [Mitchell's resistance] had the potential to escalate in to a serious" crime. *Anthony v. Coffee Cnty.*, 579 F. App'x 760, 765 (11th Cir. 2014).

As to the second factor, the parties spilt much ink arguing whether Mitchell posed an immediate threat of serious bodily harm to officers or others. The Eleventh Circuit clarified that the second factor can be reduced to a single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002). Plaintiff insists the answer to this question is "no"; Mitchell posed no immediate threat of serious injury to the officers on September 6, 2013. (Doc. 89, p. 23). She argues that, in fact, "Mitchell did not exhibit any aggressive, combative[,] or violent behavior[;]" (*Id.* at 9, 16) and that it is questionable whether "Mitchell ever had Wilson['s] [T]aser [ ] in her hand." *Id.* at 4. She continues: even assuming Mitchell held Wilson's Taser, the projectile cartridge on the device was spent, *Id.* at 17, and that therefore, the Taser could only be used in "touch-tase" mode, which rendered the device ineffective if Mitchell was more than arms' length from the officers. *Id.* Plaintiff claims "touch-tase" mode was no immediate threat of serious bodily harm, *Id.,* and ff Mitchell advanced, all the officers had to do was retreat or avoid Mitchell. *Id.* at 18. Plaintiff argues that Wilson admitted as much but used deadly force merely due to her "aversion to the unpleasant, yet non-

incapacitating sensation of a touch-tase," which Wilson uses as her reason for employing deadly force. *Id.* at 18.

Reviewing the evidence in the Plaintiff's favor, the undisputed facts show as follows. From the first moments of the encounter, Mitchell resisted by fleeing each officers' attempt to pat him down for weapons and continued to run up and down the street with the officers in pursuit. After circling back around to the Frye front porch, Mitchell refused the officers' commands and, as Mrs. Frye characterized his behavior, was "uncontrollable," although not combative. (Doc. 92-2, p. 8). But when Mitchell and the officers fell into the bushes, Mitchell's behavior changed for the worse. Wilson dropped her Taser; the Taser was picked up and used against her. (Doc. 81-5, p. 51, 68, 69). Chandler testified to Mitchell holding Wilson's Taser; Mitchell sticking the Taser's business end to Wilson; and Wilson squirming as if being tased. (Doc. 81-4, p. 60). Both Mr. and Mrs. Frye testified that they heard Wilson scream in pain at about this time. (Doc. 81-2, p. 16; Doc. 81-3, p. 29). After he exited the bushes, all three officers saw Mitchell square off and make a move with Wilson's Taser in his hand and aimed at Wilson. (Doc. 81-4, pp. 66–70; Doc. 81-5, pp. 55–63; Doc. 81-6, pp. 30–33). Therefore, the Court finds Plaintiff's conclusion Mitchell was not aggressive, armed, or an immediate threat of serious injury factually unsupported. *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (finding a court is not required to resolve disputes in the nonmovant's favor when that party's version of events is supported by insufficient evidence); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation

omitted) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.")

Additionally, Plaintiff's assertions that Mitchell was, essentially, harmless beyond arms' length, that the officers could have avoided Mitchell's advance by retreating or dodging him, and that Wilson used deadly force simply out of an "aversion" to being twice tased fail to consider two things. First, these assertions are made with the benefit of time and hindsight. Chandler and Wilson did not have that luxury of time during the course of events. Multiple witnesses testified that the events on September 6, 2013, quickly transpired. (Doc. 81-3, p. 31) (Mrs. Frye testifying that the front porch incident and shots were close); (Doc. 81-2, p. 36) (Mr. Frye testifying to Wilson's scream and the shots being separated by a few seconds); (Doc. 81-4, p. 59) (Chandler testifying that the incident in the front yard took place "very—very fast"); (Doc. 92-3, p. 14) (Wilson explaining to investigators that the incident "was really fast and after we started fighting it just became somewhat of a blur.")

Second, Wilson testified to the Taser's physical and mental affect on her. (Doc. 81-5, p. 65; Doc. 92-3, p. 11). She explained how she was concerned for her life and safety. (Doc. 81-5, p. 65). Had Mitchell succeed in tasing Wilson again, he could have gained control of Wilson's handgun and used it on her or others. Thus, Plaintiff's "aversion" characterization oversimplifies Wilson's mental state. That is, even if it were proper to consider Wilson's subjective intent, which it is not. *See Mobley v. Palm Beach Cnty. Sheriff Dept.*, 783 F.3d 1347, 1354 (11th Cir. 2015)

(holding that a court must "not consider whether an officer acted in good faith or sadistically and maliciously").  A reasonable officer would have feared having his or her handgun stripped away while under the Taser's affect a second time.  A suspect stripping an officer's handgun away from his or her possession is a grave danger. *Humphrey v. City of Headland*, No: 12-cv-366-WHA, 2012 WL 2568206, at *5 (M.D. Ala. July 2, 2012).  Chandler and Wilson were not required to wait until Mitchell was within arms' length, using the Taser—or a commandeered handgun—against one of them before they could act.  *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007).  And Plaintiff offers no authority for her proposition that the officers should have retreated or simply tried to avoid Mitchell's advances.  Thus, the Court will not "Monday morning quarterback" Chandler's and Wilson's split-second decisions "from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold-record account of what turned out to be the facts."  *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333–34 (11th Cir. 2004).

And even assuming, as the Court must, that Chandler and Wilson provided Mitchell no verbal warning before firing, their actions are not automatically rendered objectively unreasonable.  Under *Garner*, a verbal warning is not a prerequisite that Chandler and Wilson must satisfy to flip "'a magical on/off switch that'" constitutionally justifies their use of deadly force.  *See Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (quoting *Scott*, 550 U.S. at 382).  The Eleventh Circuit has declined on several occasions to "fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—

particularly where … such a warning might easily have cost the officer his life." *Penley*, 605 F.3d at 854 n.6 (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) (alteration in original); *Williams v. Deal*, 659 F. App'x 580, 601 (11th Cir. 2016). As the Supreme Court observed, "Whatever *Garner* said about the factors that *might have* justified shooting in that case, such 'preconditions' have scant applicability to [a] case[ ] which has vastly different facts." *Scott*, 550 U.S. at 383 (emphasis in original).

The facts of *Garner* that necessitated a verbal warning or unjustified the use of deadly force are materially distinguishable from this matter. As summarized by the Supreme Court:

> *Garner* held that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect, by shooting him "in the back of the head" while he was running away on foot, and when the officer "could not reasonably have believed that [the suspect] … posed any threat," and "never attempted to justify his action on any basis other than the need to prevent an escape."

*Id.* at 382–83 (internal citations omitted). The facts of this case stand in stark contrast to *Garner*. Again, Mitchell was armed with Wilson's Taser, which he had already used on her. Mitchell was not fleeing from but moving toward or beginning to move toward Wilson, who was a matter of feet from Mitchell. (Doc. 81-4, p. 64) (Chandler describing Mitchell's initial distance as "[f]ifteen, twenty feet maybe"); (Doc. 81-5, p. 57) (Wilson describing Mitchell's initial distance as eight to ten feet away). A reasonable officer, under these circumstances, could have concluded "'the hesitation in giving a warning could readily cause such a warning to be his [or her] last.'" *Carr*, 338 F.3d at 1239 n.19 (quoting *McLenagan v. Karnes*, 27 F.3d 1002,

35

1007 (4th Cir. 1994)).  Therefore, under these facts, the absence of a warning does not diminish the objective reasonableness of Chandler's and Wilson's use of deadly force.  Moreover, both Chandler and Wilson had their handguns trained on Mitchell.  This "plainly served as a nonverbal warning against approaching the officer[s]." *Deal*, 659 F. App'x at 601.

Lastly, Plaintiff attempts to inject constitutional unreasonableness based on her assertion that Wilson provoked the situation by failing "to adhere to departmental policy related to police interaction with mentally ill persons."  (Doc. 89, p. 16).  She avers that Mitchell was "comfortable" with Chandler but Wilson startled Mitchell by reaching for him in the initial pat down, which set the entire chain of events in motion.  *Id.*  Plaintiff urges the Court to consider this event, which falls outside the moment deadly force was used, in its Fourth Amendment "reasonableness" evaluation.  *Id.* at 4.  The Court declines to consider this event for three reasons.  First, Plaintiff's complaint limits her federal claim to Chandler's and Wilson's use of "excessive, unreasonable, and unnecessary deadly force."  (Doc. 1, p. 5).  Because Wilson's actions prior to the use of deadly force are not made the basis of the constitutional claim, Plaintiff cannot rely on them now to rescue that claim.

Second, § 1983 protects plaintiffs from constitutional violations, not state law violations or, as Plaintiff asserts, violations of departmental policies.  *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).  In *Whren v. United States*, the Supreme Court addressed the use of police manuals and standard procedures to evaluate what a "reasonable officer" would do under the Fourth Amendment in the

context of a traffic stop. 517 U.S. 806, 815–16 (1996). The Court concluded that because police rules, practices, and regulations vary from place to place from time to time, they are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct. *Id.* at 815. Although *Wren* involved the constitutionality of searches rather than excessive force, both inquiries—whether a search is constitutional and whether the officer has used excessive force—involve an evaluation of the "reasonableness" standard of an officer's conduct under a particular set of facts and circumstances. *See id.*; *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005).

Moreover, a recent Supreme Court decision torpedoes Plaintiff's argument. The plaintiff in *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015), supported her Fourth Amendment claim with expert testimony that the defendant law enforcement officers "fell short of their training by not using practices designed to minimize the risk of violence when dealing with the mentally ill." *Id.* at 1771. The Supreme Court canvased the caselaw and concluded that "the officers' failure to accommodate [the plaintiff's] illness [did not] violat[e] clearly established law." *Id.* at 1775. The Court then rejected the plaintiff's reliance on her expert's opinion: "Even if an officer acts contrary to her training, however, … that does not itself negate qualified immunity where it would otherwise be warranted." *Id.* at 1777. Therefore, it cannot be said that Wilson's choice in initially approaching Mitchell, assuming she violated proper municipal procedure, renders any future actions per se unreasonable.

Third, assuming Wilson failed to follow the procedure in question, MO-2011-03, her actions constituting such failure occurred outside of the relevant timeframe upon which the Court makes its "reasonableness" determination. In *Menuel v. City of Atlanta*, the Eleventh Circuit evaluated the relevant time period for deciding an excessive force claim based on two officers shooting a mentally ill individual and reasoned, in relevant part:

> Nearly every court has commented on [the] fact that all decisions about deadly force (or any force) "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." (citation omitted)  We always judge a decision made … in an instant or two.  It is true we consider the whole of the event as it appears to the officer involved, but we recognize that the decision to shoot can only be made after the briefest reflection, so brief that "reflection" is the wrong word….
>
> ….
>
> Our historical emphasis on the shortness of the legally relevant time period is not accidental.  The time-frame is a crucial aspect of excessive force cases.  Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire.  If the officer had decided to do nothing, then no force would have been used.  In this sense, the police officer always causes the trouble.  But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.
>
> …Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.  This is what we mean when we say we refuse to second-guess the officer.

25 F.3d 990, 996–97 (11th Cir. 1994) (citation omitted) (alterations and ellipsis in original).  The Court finds this reasoning still sound after thirty-plus years.  It embodies a major premise that the Eleventh Circuit has restated again and again:

officers presented with the choice to use or not use force are faced with making a split-second decision. Whether that decision is reasonable should be based on the totality of circumstances in that moment.[8] Thus, evaluating what Wilson may have done when she initially approached Mitchell deviates from this premise.

Given this, the Court concludes that the second and third *Crenshaw* factors weigh in favor of Chandler and Wilson. Mitchell was actively resisting officers' attempts to place him under arrest. Both officers "had probable cause to believe that [Mitchell] posed a threat of serious physical harm." *See Robinson*, 415 F.3d at 1256. In other words, would Mitchell "have appeared to reasonable officers to have been gravely dangerous"? *See Pace*, 283 F.3d at 1281. This question is answered in the affirmative. Therefore, even construing the facts in Plaintiff's favor, the Court finds the countervailing government interest in this matter was great, which means Chandler's and Wilson's use of deadly force did not amount to a constitutional violation.

**(ii) Whether Chandler and Wilson Violated Clearly Established Law.**

But even if Chandler's and Wilson's actions amounted to a constitutional violation, the officers contend Plaintiff cannot point to factually analogous caselaw that would provide them with fair warning that their actions on September 6, 2013, were unconstitutional. (Doc. 75, p. 9; Doc. 80, p. 15). Therefore, the officers are due

---

[8] The Eleventh Circuit is not alone in limiting the relevant time period evaluated in the use of deadly force against a mentally ill individual to the moment the threat occurs. *See, e.g., Rockwell v. Brown*, 664 F.3d 985, 989–92 (5th Cir. 2011) (limiting the excessive force inquiry to "whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]").

qualified immunity because Plaintiff cannot satisfy both prongs of *Saucier*. Plaintiff

parries that Chandler and Wilson frame the clearly established prong "too

narrowly." (Doc. 19, p. 23). "They seem to argue that unless Plaintiff is able to

point to a case from the Supreme Court or the Eleventh Circuit in which qualified

immunity was disallowed based upon facts which are essentially indistinguishable

from the instant case, then they are entitled to qualified immunity." *Id.* In support

of her position, Plaintiff cites *Tennessee v. Garner*, 471 U.S. 1 (1985), as clearly

establishing one's right to be "free from deadly force when posing no threat of death

or serious bodily injury to anyone." *Id.*

Whether a right is clearly established "turns on the law at the time of the

incident 'in light of the specific context of the case, not as a broad general

proposition....'" *Merrick v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) (quoting

*Saucier*, 533 U.S. at 201). More simply, the facts in question "must be materially

similar to the facts in the precedent that clearly establishes the deprivation." *Id.*

(citing *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1032 (11th Cir. 2001) (en banc),

*abrogated on other grounds*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Clearly established law provides officers with fair warning of unconstitutional

conduct. *Id.* The Eleventh Circuit offered the following advice to district courts

tasked with comparing alleged constitutional deprivations against case law

contended to show a clearly established right:

> For qualified immunity purposes, a pre-existing precedent is
> materially similar to the circumstances facing the official when the
> specific circumstances facing the official are enough like the facts in
> the precedent that no reasonable, similarly situated official could

believe that the factual differences between the precedent and the circumstances facing the official *might* make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguable significant facts or contains an additional arguable significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing the official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—*not* clearly established when the defendant acted.

*Marsh*, 268 F.3d at 1032. "Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis." *Merricks*, 785 F.3d at 559.

Here, Plaintiff cites only *Garner* as putting Chandler or Wilson on notice, as of September 6, 2013, that their actions were unconstitutional. As explained *supra*, *Garner* and this case are materially distinguishable. Thus, *Garner* cannot represent the basis for clearly established law Plaintiff now contends.[9]

To the contrary, clearly established law as of September 6, 2013, put Chandler and Wilson on notice that deadly force was constitutionally permissible in the situation they faced. In *McCormick v. City of Fort Lauderdale*, the Eleventh Circuit found an officer's use of deadly force objectively reasonable when a suspect charged the officer with a raised walking stick. 333 F.3d 1234, 1246 (11th Cir.

---

[9] Plaintiff cites the Fourth Circuit Court of Appeals case of *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), as support for his *Garner* contention. However, as noted, sister-circuit decisions are not considered in deciding whether a right was clearly established.

2003).  And notably, although decided after the incident in question, the Eleventh

Circuit has recently cited *McCormick* in holding that an officer's use of deadly force

did not violate clearly established law when a suspect advanced on an officer with a

lose pair of handcuffs as a weapon, which the suspect had already used to cause the

officer a head wound.  *Martinez v. City of Pembroke Pines*, 648 F. App'x 888, 893

(11th Cir. 2016).  A key similarity in *McCormick*, *Martinez*, and the present

situation exists.  In all three scenarios, the suspect's weapon was one that was

essentially ineffective beyond arms' length.  Given the above, Plaintiff failed to meet

her burden and show that Chandler and Wilson violated a right that was clearly

established as of September 6, 2013.

In summary, Plaintiff has not established that Chandler and Wilson

committed a constitutional violation or that a constitutional right violated was

clearly established at the time in question.  Accordingly, Chandler and Wilson are

entitled to qualified immunity as to Plaintiff's constitutional claim.  Chandler and

Wilson's motion for summary judgment on Count I is **GRANTED** on this basis.

### B. Federal Claims Against the City (Count III and Count IV)

The City moves for summary judgment as to Plaintiff's claims against it

pursuant to 42 U.S.C. § 1983, "under theories alleging an improper investigation

into the shooting death of [ ] Mitchell (Count [III]) and a failure to train, investigate,

supervise[,] or discipline the City's police officers (Count IV)."  (Doc. 82, p. 1).  The

City contends it is not liable for two reasons: (1) municipal liability based upon

*respondeat superior* is improper and (2) municipal liability is improper when

undisputed facts show its employees caused no constitutional violation. *Id.* at 1–2. Plaintiff counters that the undisputed facts establish a constitutional violation, which precludes summary judgment for the City. (Doc. 89, p. 21).

The Eleventh Circuit has stated that "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Conversely, it is firmly established that a municipality cannot be held liable "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978). Also firmly established is the principle that a plaintiff's claim against a municipality cannot survive summary judgment if no constitutional violation occurred. *Best v. Cobb Cnty., Ga.*, 239 F. App'x 501, 504 (11th Cir. 2007) (per curiam). Further, "an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

Here, as outlined above, Plaintiff failed to present facts establishing a city employee committed a constitutional violation. Thus, the Court need not consider whether the City had a custom or policy amounting to deliberate indifference of a right, which is causally linked to a city employee's alleged actions. The Court

**GRANTS** summary judgment for the City on Count III and Count IV.

## C. State Law Claims Against Chandler and Wilson (Count II and Count IV)

In Count II, Plaintiff alleges, or at least appears to allege, that Chandler and Wilson assaulted and battered Mitchell, "or otherwise unlawfully used deadly and excessive force." (Doc. 1, p. 5). It is unclear whether Plaintiff travels under federal law or state law in Count II or whether Count II alleges assault and battery or wrongful death. To the extent Count II alleges a claim of assault and battery, the Court holds as follows. Under Alabama's survivorship statute, as promulgated in Alabama Code § 6-5-462, a decedent's federal or state tort claim does not survive his or her death. *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1046 (11th Cir. 2011); *Cont'l Nat'l Indem. Co. v. Fields*, 926 So. 2d 1033, 1037 (Ala. 2005) ("As a general rule, causes of action in tort do not survive in favor of the personal representative of the deceased.") Therefore, to the extent Count II alleges a claim of assault and battery, it is improper, and the Court **GRANTS** summary judgment. To the extent Count II alleges a federal claim regarding the deadly force used against Mitchell, it is addressed *supra* in § 2(b) and due summary judgment for the reasons stated therein.

To the extent Count II and Count IV both allege a wrongful death claim under Alabama law, the Court concludes as follows. Defendants invoke both discretionary function immunity and State-agent immunity for the state law claims of wrongful death. Discretionary function immunity, as articulated by the Alabama Legislature, provides in pertinent part:

> Every peace officer … who is employed or appointed pursuant to the Constitution or statutes of this state … and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violation of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest, and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a) (1975). In *Ex parte Cranman*, the Alabama Supreme Court "restate[d] the rule governing State-agent immunity":

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent
>
> \*\*\*
>
> (2) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons ….

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) (emphasis in original).[10]  As Alabama Courts have noted, "By enacting [§ 6-5-338], the Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts.  Indeed, '[t]his statute, by its terms, extends *state-agent* immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties.'"  *Howard v. City of Atmore*, 887 So. 2d 201, 203 (Ala. 2003) (citations omitted).  Indubitably, Chandler's and Wilson's actions in responding to

---

[10] Although *Ex parte Cranman* was a plurality decision, the test for determining State-agent immunity as restated in *Cranman* was adopted in *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000).

Mrs. Frye's complaint and effectuating Mitchell's arrest qualify as an "exercise[e of] judgment in the enforcement" of Alabama's criminal laws.

But the Court's analysis cannot end here. The Alabama Supreme Court continued, "Notwithstanding anything to the contrary in the forgoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity […] when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* (emphasis in original). At this point, the burden shifts to Plaintiff to demonstrate one or more of the aforementioned exceptions apply. *See Ex parte City of Montgomery*, 99 So. 3d 282, 293–94 (Ala. 2012). To rise to this level, the Alabama Supreme Court "has required the plaintiff to prove that the defendants' conduct was 'so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith.'" *Ex parte Tuscaloosa Cnty.*, 796 So. 2d 1100, 1107 (Ala. 2000) (quoting *Couch v. City of Sheffield*, 708 So. 2d 144, 153–54 (Ala. 1998)). The inquiry as to whether the state agent qualifies for immunity under this section is a fact-specific one. *See Ex parte Dangerfield*, 49 So. 3d 675, 682 (Ala. 2010).

It is settled that Chandler and Wilson were engaged in official duties and exercising judgment in law enforcement. Plaintiff contends Chandler and Wilson "acted intentionally, willfully, in bad faith[,] or maliciously" because Mitchell posed no threat. (Doc. 89, p. 20). Viewing the facts in the light most favorable to Plaintiff, however, it cannot be said Mitchell posed no threat to Chandler and Wilson. As discussed above, Mitchell had Wilson's Taser; had already used the Taser on

Wilson, and advanced toward Wilson with the Taser aimed at her. Thus, Plaintiff's contention is unavailing.

Furthermore, Plaintiff's contention that Wilson failed to follow the City's memorandum policy addressing the recognition and handling of persons with mental illness, MO-2011-03, offers no basis to deny State-agent immunity or discretionary function immunity. A "policy or procedure [that] constitutes guidelines, not 'detailed rules and regulations such as those stated on a checklist' that *must* be followed by an officer" are insufficient to show an officer acted beyond his or her authority. *Ex parte Brown*, 182 So. 3d 495, 506 (Ala. 2015) (quoting *Ex parte Butts*, 775 So. 2d at 178) (emphasis in original). MO-2011-03 does not set forth strict rules or a checklist for officers to follow but establishes suggestive procedures to aid in "recogniz[ing], understand[ing], and deal[ing] with a person with mental illness." (Doc. 81-6, p. 17). "[T]here are times when force must be employed in order to place a suspect under arrest, regardless of whether that suspect may be mentally ill or emotionally disturbed." *Id.* Notwithstanding, Plaintiff categorizes Wilson's treatment of Wilson as, "at best, reckless." (Doc. 89, p. 7). Still, this is insufficient to remove State-agent immunity or discretionary function immunity. "[The Alabama Supreme Court] has previously held that poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*." *Ex parte Randall*, 971 So. 2d 652, 664 (Ala. 2007); *see also Adams v. City of Mobile*, No: 07-cv-0864-WS, 2008 WL 4531768, at

*10–11 (S.D. Ala. Oct. 9, 2008) (applying this principle).  Surely reckless conduct is akin to wanton misconduct, which does not rise to the level of conduct necessary to obviate State-agent immunity or discretionary function immunity.  Because Plaintiff has not established that State-agent immunity or discretionary function immunity should be removed, Count II and Count IV are dismissed.  Therefore, the Court **GRANTS** summary judgment in favor of Chandler and Wilson on Count II and Count IV of the Complaint.

## VI. CONCLUSION

For the reasons set forth herein, the Court **GRANTS** Defendants' Motions for Summary Judgment (Doc. 73; Doc. 78; Doc. 82) as to all counts.  Further, the Court **GRANTS** Defendants' Motion to Strike.  (Doc. 98).   Final judgment will be issued by separate Order.

**DONE** and **ORDERED** this 3rd day of May, 2017.

/s/  Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE